IN THE SUPREME COURT OF NORTH CAROLINA

No. 124PA19

Filed 3 April 2020

Donna J. PRESTON, Administrator of the Estate of WILLIAM M. PRESTON

v.

ASSADOLLAH MOVAHED, M.D., DEEPAK JOSHI, M.D., AND PITT COUNTY
MEMORIAL HOSPITAL, INCORPORATED, D/B/A VIDANT MEDICAL CENTER

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision

of the Court of Appeals, 825 S.E.2d 657 (N.C. Ct. App. 2019), affirming an order

entered on 25 October 2017 by Judge Jeffery B. Foster in Superior Court, Pitt County.

Heard in the Supreme Court on 7 January 2020.

> *Edwards Kirby, L.L.P., by John R. Edwards, David F. Kirby, and Mary
> Kathryn Kurth, and Laurie Armstrong Law, PLLC, by Laurie Armstrong, for
> plaintiff-appellant.*
>
> *Smith Anderson Blount Dorsett Mitchell & Jernigan, LLP, by John D. Madden
> and Robert E. Desmond, for defendant-appellee Assadollah Movahed, M.D.*

EARLS, Justice.

Plaintiff, Donna Preston, the widow and estate representative of William M.

Preston, appealed the trial court's order granting the motion to dismiss of defendant,

Dr. Assadolah Movahed,[1] on the basis that plaintiff's medical malpractice complaint

---

[1] Defendants Deepak Joshi, M.D., and Pitt County Memorial Hospital, Incorporated, d/b/a Vidant Medical Center were parties in the original appeal but settled with plaintiff prior to the issuing of the Court of Appeals' opinion. They were not parties to the appeal here.

failed to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure. The Court of Appeals affirmed, holding that competent evidence supported the trial court's determination that the expert witness retained by plaintiff to review Mr. Preston's medical care was unwilling to testify that defendant did not comply with the applicable standard of care, notwithstanding that the evidence would support findings to the contrary. *Preston v. Movahed*, 825 S.E.2d 657, 662–65 (N.C. Ct. App. 2019). Because we conclude that in the light most favorable to plaintiff the factual record demonstrates that at the time of the filing of the complaint plaintiff's expert was willing to testify that defendant breached the applicable standard of care and plaintiff reasonably expected him to qualify as an expert, we reverse the decision of the Court of Appeals and remand for further proceedings.

## Background

The undisputed facts from the pleadings and evidence before the trial court tend to show that on the morning of 3 February 2014, 54-year-old William Preston went to the emergency room at Vidant Medical Center complaining of shortness of breath and left-sided chest pain radiating to his left arm, symptoms that had begun twelve hours earlier. The intake physician noted Mr. Preston's risk factors for coronary artery disease, including hypertension, a history of smoking, and his age, and further noted that Mr. Preston's chest pain was relieved by nitroglycerin.

Electrocardiograms (EKGs[2]) taken in the emergency room were abnormal, suggesting myocardial ischemia, a condition where the heart receives insufficient blood flow. After about two hours, Mr. Preston again complained of left arm pain, which was again relieved by nitroglycerin. Mr. Preston was admitted to the hospital for observation and the attending physician ordered further testing, including a "nuclear stress test."

In a nuclear stress test, an EKG is taken while the patient exercises on a treadmill. The "nuclear" aspect involves injecting the patient with a "radiotracer" dye and using gamma rays to produce images of the patient's heart. During Mr. Preston's test that took place on the following day, he reported severe "chest pain and left arm pain at a level of 10/10" and the test was terminated due to shortness of breath and fatigue.

Defendant, a nuclear cardiologist, was assigned to read and interpret the results of Mr. Preston's stress test. In his deposition, defendant explained that when interpreting the results of a nuclear stress test, he receives a document with the patient's information and medical history, EKG "tracings" from the exercise portion of the test, and the nuclear images. Defendant stated that he reviews this information "stage by stage," beginning with the patient's history and risk factors, then reviewing the EKG tracings, and then finally the nuclear images. According to

---

[2] The filings in the trial court and the parties' briefs refer to electrocardiograms interchangeably as EKGs and ECGs. We use only the term EKG for consistency.

defendant, he "complete[s] one study, finish[es] with the study," and moves to the next, making findings at each stage before making ultimate findings and preparing a report.

Here defendant received Mr. Preston's information sheet, which noted Mr. Preston's use of tobacco, his hypertension, of which there was a family history, and his chest pain. With respect to the EKG tracings, defendant's written report noted that there was "no definite significant additional diagnostic ST segment depression or ST segment elevation recorded during exercise and recovery." Regarding the nuclear images, defendant's report noted a perfusion defect in the heart, which he thought was likely due to "significant gas in the stomach" but could not rule out ischemia. His report stated that "one may consider coronary CTA for further evaluation of coronary arteries in addition to aggressive risk factor modification."[3] Defendant gave an oral report of his interpretation of the results of the test to his first-year cardiology fellow, Dr. Deepak Joshi, who entered a "fellow note" into Mr. Preston's chart. The note stated: "[n]uclear stress test showed mild ischemia versus attenuation artifact in the inferolateral/inferior apical area. Discussed with Dr. Movahed, attending. Recommend outpatient cardiac CTA. Will arrange for the test and outpatient cardiology follow-up. Plan discussed with primary team."

---

[3] Defendant testified that aggressive risk factor modification refers to activities like ceasing smoking, losing weight, exercising, and using a low-dose aspirin.

Dr. Neha Doctor, a hospitalist, examined Mr. Preston after the nuclear stress test. Plaintiff alleges that she and Mr. Preston were informed that the cardiac tests had been negative and that Mr. Preston's left-sided pain was likely neurological, not heart-related. Dr. Doctor discharged Mr. Preston with instructions to follow up with his primary care physician about an MRI and to follow up with the CT angiogram (CTA) appointment made by the cardiology team. This outpatient cardiology follow-up was scheduled for sixteen days later on 20 February 2014.

Two days after being discharged, Mr. Preston saw his primary care physician, who referred him for an MRI of his spine. The MRI showed no neurological cause for Mr. Preston's continuing left arm pain.

On 13 February 2014, a week before his scheduled cardiac follow-up, Mr. Preston was at home when he called out to his wife. When plaintiff reached her husband, she found him collapsed on the floor and unresponsive. Responding to Plaintiff's 911 call, EMS found Mr. Preston pulseless and breathing about four times per minute, and therefore began resuscitation measures and transporting him to Vidant Medical Center. At Vidant's Emergency Department, further resuscitation efforts were unsuccessful and Mr. Preston was pronounced dead at 5:35 that afternoon. An autopsy revealed severe narrowing of the circumflex and right coronary arteries, acute and evolving myocardial infarction, and transmural rupture of the left ventricular wall of Mr. Preston's heart.

On 25 November 2015, plaintiff filed a wrongful death action (the First Complaint) naming multiple defendants involved in Mr. Preston's medical care, including Dr. Neha Doctor. In accordance with the special pleading requirements of section (j) (Medical malpractice) of Rule 9 (Pleading special matters) of the North Carolina Rules of Civil Procedure, plaintiff alleged in the complaint that the medical care and medical records pertaining to Mr. Preston's treatment had been reviewed by a person reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and who was willing to testify that the medical care did not comply with the applicable standard of care. Dr. Stuart Toporoff, a cardiologist, submitted an affidavit (his First Affidavit) averring that he had reviewed the medical care and records and was willing to testify that the care provided failed to comply with the applicable standard of care. On 29 January 2016, Dr. Doctor filed an answer alleging that Dr. Movahed's written report of Mr. Preston's stress test was not available to her when she was treating Mr. Preston, and that the cardiology team had recommended and taken responsibility for scheduling Mr. Preston's outpatient follow-up CTA.

On 12 February 2016 plaintiff filed a second complaint (the Second Complaint) naming as defendants Dr. Movahed, Dr. Deepak Joshi, and Pitt County Memorial Hospital, Inc., d/b/a Vidant Medical Center (the Hospital). Plaintiff's Second Complaint, which again included her Rule 9(j) expert certification, alleged that defendant was negligent by, *inter alia*, failing to "accurately interpret and

communicate the findings and significance of diagnostic tests performed on Mr. Preston," failing to "timely suggest and perform a full assessment and work-up to rule out life-threatening acute coronary artery disease for a patient at high risk for the disease, including but not limited to, cardiac catheterization," and failing "to recommend a cardiology consult for Mr. Preston prior to his discharge from Vidant Medical Center with acute chest pain." On the same day the Second Complaint was filed, Dr. Toporoff submitted a second affidavit (his Second Affidavit) stating that he had reviewed the medical care and records and was willing to testify that the care provided by the named defendants failed to comply with the applicable standard of care. Dr. Toporoff averred that the case materials were first provided to him in July of 2015 and that "[a]dditional materials were provided to [him] on October 12 and October 29, 2015 and on February 10, 2016." According to the affidavit, Dr. Toporoff's stated that based on his review of the medical records and his training and experience,

> [i]t is my opinion that medical care provided to William Preston during his admission to Vidant Medical Center on February 3–4, 2014 for chest pain failed to comply with the applicable standard of care for the evaluation of a patient with chest and arm pain who presented with Mr. Preston's signs, symptoms, and medical history. . . . I have expressed my willingness to testify to the above if called upon to do so.

By consent order filed 14 March 2016, the two actions were consolidated for discovery and trial.

During a subsequent deposition on 23 March 2017, Dr. Toporoff testified that he was critical of defendant's interpretation and communication of the results of the nuclear stress test. Dr. Toporoff stated that he had initially been unwilling to testify against defendant because he was not qualified to criticize defendant's interpretation of the nuclear images from the test and that he "refused to be a nuclear cardiologist against him." Dr. Toporoff confirmed, however, that at the time he submitted his Second Affidavit he was comfortable stating that defendant "failed to meet the standard of care as it applies to a cardiologist interpreting a treadmill stress test."

On 16 June 2017, defendant filed a motion to dismiss pursuant to Rules 12(b)(6), 9(j) and 41 of the North Carolina Rules of Civil Procedure. On 15 September 2017, Dr. Toporoff submitted a third affidavit (his Third Affidavit), stating that prior to the First Complaint he communicated to plaintiff's counsel that he did not have sufficient information to state that defendant and/or Dr. Joshi clearly violated any standards of care. However, Dr. Toporoff stated that following discovery answers served by Vidant Medical Center and Dr. Doctor regarding the communication of Mr. Preston's stress test results by defendant and Dr. Joshi, he learned "that Dr. Movahed's report was NOT made available to [Dr. Doctor] prior to Mr. Preston's discharge." Dr. Toporoff averred that he informed plaintiff's counsel on 12 February 2016 that he was willing to testify that defendant and Dr. Joshi breached the applicable standard of care by "fail[ing] to interpret, diagnose, document and communicate to the ordering physician the presence of chest pain and ST wave

depression changes during Mr. Preston's nuclear stress test that were consistent with ischemia; and failure to recommend an immediate cardiology consult for Mr. Preston prior to his discharge." Dr. Toporoff stated that he held these opinions "[s]ince [his] review of the totality of these medical records and documents in February in 2016."

At the hearing on the motion to dismiss on 18 September 2017, defendant argued that plaintiff failed to comply with Rule 9(j) because Dr. Toporoff could not reasonably be expected to qualify as an expert witness and was not willing to testify that defendant breached the applicable standard of care. The trial court entered an order on 25 October 2016, in which it found, in pertinent part:

> 22. Dr. Toporoff . . . admitted that Dr. Movahed's involvement was limited to the interpretation of the nuclear stress test that was performed on Mr. Preston.
>
> . . . .
>
> 24. Dr. Toporoff only agreed to testify in the Second Lawsuit if Plaintiff's counsel retained a nuclear cardiologist.
>
> . . . .
>
> 27. [A]s of the date the Second Lawsuit was filed, Plaintiff had no cardiologist competent or willing to testify against . . . Dr. Movahed.

The trial court also found that plaintiff could not have reasonably expected Dr. Toporoff to qualify as an expert witness. Accordingly, the trial court concluded that plaintiff failed to comply with Rule 9(j) and granted defendant's motion to dismiss.

On 3 November 2017, a Consent Order was entered on the parties' Consent Motion to Sever the two cases for appeal. Plaintiff appealed this case to the Court of Appeals.

At the Court of Appeals,[4] plaintiff argued, *inter alia*, that the trial court's Findings 22, 24, and 27 were not supported by competent evidence and that the trial court erred in concluding that plaintiff failed to comply with Rule 9(j). The court disagreed, first stating that the standard of review was de novo and that:

> [w]here, as here, "a trial court determines a Rule 9(j) certification is not supported by the facts, 'the court must make written findings of fact to allow a reviewing appellate court to determine whether those findings are supported by competent evidence, whether the conclusions of law are supported by those findings, and, in turn, whether those conclusions support the trial court's ultimate determination.' "

*Preston*, 825 S.E.2d at 662 (quoting *Estate v. Wooden ex rel. Jones v. Hillcrest Convalescent Ctr., Inc.*, 222 N.C. App. 396, 403 (2012)).

Applying this standard, the court first addressed plaintiff's challenge to Finding of Fact 22 and concluded that it was supported by the following exchange from Dr. Toporoff's deposition:

> Q.     You know that Dr. Movahed's involvement in this case is the interpretation of the nuclear stress test that was performed on Mr. Preston? You understand that; correct?
>
> A.     Yes.

---

[4] Plaintiff entered into settlement agreements with Dr. Joshi and the Hospital and on plaintiff's motions the Court of Appeals dismissed those parties from the appeal on 15 August 2018 and 13 September 2018, respectively.

*Id.* at 662. While Plaintiff contended that "the nuclear stress test involves two parts: the exercise treadmill stress test and the nuclear heart images" and that "Dr. Toporoff was critical of Dr. Movahed's interpretation of the . . . exercise treadmill portion, which revealed issues with Mr. Preston's heart requiring immediate further testing," the court determined that plaintiff's explanation did not make the challenged finding erroneous because "[t]he well-established rule is that findings of fact by the trial court supported by competent evidence are binding on the appellate courts even if the evidence would support a contrary finding." *Id.* at 662 (quoting *Scott v. Scott*, 336 N.C. 284, 291, 442 S.E.2d 493, 497 (1994)).

The court next addressed plaintiff's argument that Finding 24 was erroneous because Dr. Toporoff: (1) opined in his Rule 9(j) affidavits that Preston's medical care failed to comply with the standard of care and "expressed [his] willingness to testify to the above if called upon to do so"; and (2) testified when deposed that, at the time he signed his Second Affidavit prior to the filing of the Second Complaint, he "felt comfortable saying that Dr. Movahed failed to meet the standard of care as to the interpretation of the exercise treadmill test." *Id.* at 662. The court determined that Dr. Toporoff's deposition testimony, including his testimony that "he would not testify against Dr. Movahed unless [plaintiff] came up with a nuclear cardiologist" provided competent evidence directly supporting the trial court's challenged finding, even if Dr. Toporoff's Rule 9(j) affidavits or other deposition testimony could support a different finding. *Id.* at 663. Further, the court rejected plaintiff's efforts to

distinguish between Dr. Toporoff's opinions of defendant's interpretation of the NST images as opposed to the results of the treadmill stress test. *See id.* ("Plaintiff emphasizes Dr. Toporoff's later deposition testimony in which he confirmed he "had opinions separate and apart from the NST images" and was "comfortable . . . when [he] did the 9(j) affidavit[ ] . . . saying that Dr. Movahed failed to meet the standard of care as it applies to a cardiologist interpreting a treadmill stress test[.]"). According to the court:

> Dr. Toporoff's statement that he "had opinions separate and apart from the NST images" was immediately followed by his confirmation that he "didn't feel as confident expressing those [opinions] until [he] had some kind . . . of support for the NST images as well." Moreover, merely having an opinion does not indicate one's willingness to testify as to that opinion. Additionally, Dr. Toporoff's confirmation that he was "comfortable . . . when [he] did the 9(j) affidavit . . . saying that Dr. Movahed failed to meet the standard of care as it applies to a cardiologist interpreting a treadmill stress test" was not an unequivocal assertion that he was "willing to testify" against Dr. Movahed. Regardless of whether Dr. Toporoff had opinions or was comfortable saying something about Dr. Movahed regarding the treadmill-stress-test component of interpreting the NST, Dr. Toporoff's testimony considered contextually establishes that his willingness to testify against Dr. Movahed in any capacity was conditioned upon having the support of a nuclear cardiologist who was competent and willing to testify against Dr. Movahed as to the nuclear-imaging component.

*Id.*

Next, the court addressed plaintiff's challenge to Finding 27. Having previously concluded that evidence supported the trial court's finding that Dr.

Toporoff only agreed to testify if plaintiff retained a nuclear cardiologist, the court noted that the two nuclear cardiologists were consulted months after the Second Complaint was filed and after the statute of limitations had expired and concluded that Finding 27 was supported by competent evidence. *Id.* at 663–64.

Finally, the court reviewed whether the trial court's findings support its conclusions and its ultimate decision to dismiss plaintiff's complaint for substantive Rule 9(j) noncompliance. In light of the findings that Dr. Toporoff was plaintiff's only cardiologist who had reviewed Preston's care before the Second Complaint was filed, that Toporoff only agreed to testify if plaintiff hired a nuclear cardiologist, and that plaintiff failed to consult with the other nuclear cardiologists she retained until months after she filed the Second Complaint, the court determined that the trial court correctly concluded that plaintiff's Second Complaint failed to comply with Rule 9(j) because she had no cardiologist willing to testify against defendant at the time of filing. *Id.* at 665. In light of this conclusion, the court did not address the trial court's determination that plaintiff failed to substantively comply with Rule 9(j)'s requirement that it was reasonable for plaintiff to expect Dr. Toporoff to qualify as an expert witness against defendant. *Id.* at 665.

Plaintiff filed a petition for discretionary review on the general issues of the appropriate legal standard to apply to a motion to dismiss on Rule 9(j) grounds and whether the Court of Appeals erred in failing to conduct a *de novo* review of the trial court's order dismissing the complaint. Defendant's response to the petition indicated

their intent to present to this Court the further issue of whether Dr. Toporoff was qualified to testify against Dr. Movahed. This Court allowed the petition on 14 August 2019.

Analysis

After careful review of the record, we conclude that both of the lower courts erred in failing to view the evidence regarding Dr. Toporoff's willingness to testify under Rule 9(j) in the light most favorable to plaintiff and that the Court of Appeals, in its *de novo* review, erred by deferring entirely to the findings of the trial court.

"Rule 9(j) serves as a gatekeeper, enacted by the legislature, to prevent frivolous malpractice claims by requiring expert review *before* filing of the action." *Vaughan v. Mashburn*, 371 N.C. 428, 434, 817 S.E.2d 370, 375 (2018) (quoting *Moore v. Proper*, 366 N.C. 25, 31, 726 S.E.2d 812, 817 (2012)). The rule provides, in pertinent part:

> Any complaint alleging medical malpractice by a health care provider pursuant to G.S. 90-21.11(2)a. in failing to comply with the applicable standard of care under G.S. 90-21.12 shall be dismissed unless:
>
> > (1) The pleading specifically asserts that the medical care and all medical records pertaining to the alleged negligence that are available to the plaintiff after reasonable inquiry have been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care;

N.C.G.S. § 1A-1, Rule 9(j) (2019).[5]  Thus, the rule prevents frivolous claims "by precluding any filing in the first place by a plaintiff who is unable to procure an expert who both meets the appropriate qualifications and, after reviewing the medical care and available records, is willing to testify that the medical care at issue fell below the standard of care."  *Vaughan*, 371 N.C. at 435, 817 S.E.2d at 375.

In *Moore v. Proper*, this Court addressed the manner in which a trial court should evaluate compliance with Rule 9(j), as well as the standard of review for a reviewing court on appeal.  There, the plaintiff filed a medical malpractice complaint against the defendants alleging that the defendants were "negligent in the performance of her tooth extraction and in failing to provide follow-up care."  *Moore*, 366 N.C. at 26, 726 S.E.2d at 814.  Following a deposition of the plaintiff's Rule 9(j) certification expert, the defendants filed a motion for summary judgment pursuant to Rule 9(j).  The trial court granted the defendants' motion and dismissed the

---

[5] The rule also provides that a complaint is in compliance if:

> (2) The pleading specifically asserts that the medical care and all medical records pertaining to the alleged negligence that are available to the plaintiff after reasonable inquiry have been reviewed by a person that the complainant will seek to have qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care, and the motion is filed with the complaint; or

> (3) The pleading alleges facts establishing negligence under the existing common-law doctrine of res ipsa loquitur.

N.C.G.S. 1A-1, Rule 9(j).

plaintiff's case for noncompliance with Rule 9(j), stating: "no reasonable person would have expected [the plaintiff's expert] to qualify as an expert witness under Rule 702." *Id.* at 28, 726 S.E.2d at 815. Following a split decision in the Court of Appeals reversing the trial court, the defendants appealed to this Court.

The Court first addressed whether an expert must actually qualify under Rule 702 in order to satisfy Rule 9(j)'s requirement that the certification expert "is reasonably expected to qualify as an expert witness under Rule 702." The Court noted that "Rule 9(j) . . . operates as a preliminary qualifier to 'control pleadings' rather than to act as a general mechanism to exclude expert testimony." *Id.* at 31, 726 S.E.2d at 817. Moreover, because of the presumption "that that the legislature carefully chose each word used," and in order to "give every word of the statute effect," the Court concluded: "we must ensure that the two questions are not collapsed into one. *Id.* at 31, 726 S.E.2d at 817. Thus, while "[t]he trial court has wide discretion to allow or exclude testimony under" Rule 702, *id.* at 31, 726 S.E.2d at 817 (quoting *State v. Bullard*, 312 N.C. 129, 140, 322 S.E.2d 370, 376 (1984)), "the preliminary, gatekeeping question of whether a proffered expert witness is 'reasonably expected to qualify as an expert witness under Rule 702' is a different inquiry," *id.* at 31, 726 S.E.2d at 817 (citing N.C.G.S. § 1A-1, Rule 9(j)); *see also id.* at 31, 726 S.E.2d at 817 (stating that "a trial court must analyze whether a plaintiff complied with Rule 9(j) by including a certification complying with the Rule before the court reaches the

ultimate determination of whether the proffered expert witness actually qualifies under Rule 702").

In addressing the Rule 9(j) inquiry, the Court explained that "[b]ecause Rule 9(j) requires certification at the time of filing that the necessary expert review has occurred, compliance or noncompliance with the Rule is determined at the time of filing." *Id.* at 31, 726 S.E.2d at 817 (citations omitted). The Court agreed with previous Court of Appeals precedent holding that "a court should look at 'the facts and circumstances known or those which should have been known to the pleader' at the time of filing," *id.* at 31, 726 S.E.2d at 817 (quoting *Trapp v. Maccioli*, 129 N.C. App. 237, 241, 497 S.E.2d 708, 711 (1998)), "as any reasonable belief must necessarily be based on the exercise of reasonable diligence under the circumstances," *id.* at 31, 726 S.E.2d at 817 (citing *Fort Worth & Denver City Ry. Co. v. Hegwood*, 198 N.C. 309, 317, 151 S.E. 641, 645 (1930)). Additionally, the Court noted that "a complaint facially valid under Rule 9(j) may be dismissed if subsequent discovery establishes that the certification is not supported by the facts, at least to the extent that the exercise of reasonable diligence would have led the party to the understanding that its expectation was unreasonable." *Id.* at 31–32, 726 S.E.2d at 817 (citing *Barringer v. Wake Forest Univ. Baptist Med. Ctr.*, 197 N.C. App. 238, 255, 677 S.E.2d 465, 477 (2009); *Ford v. McCain*, 192 N.C. App. 667, 672, 666 S.E.2d 153, 157 (2008)). The Court further explained:

> Though the party is not necessarily required to know all the information produced during discovery at the time of filing, the trial court will be able to glean much of what the party knew or should have known from subsequent discovery materials. But to the extent there are *reasonable* disputes or ambiguities in the forecasted evidence, the trial court should draw all reasonable inferences in favor of the nonmoving party at this preliminary stage of determining whether the party *reasonably expected* the expert witness to qualify under Rule 702. When the trial court determines that reliance on disputed or ambiguous forecasted evidence was not reasonable, the court must make written findings of fact to allow a reviewing appellate court to determine whether those findings are supported by competent evidence, whether the conclusions of law are supported by those findings, and, in turn, whether those conclusions support the trial court's ultimate determination. We note that because the trial court is not generally permitted to make factual findings at the summary judgment stage, a finding that reliance on a fact or inference is not reasonable will occur only in the rare case in which no reasonable person would so rely.

*Id.* at 32, 726 S.E.2d 817–18 (citations omitted).

Applying this standard, the *Moore* Court—construing all disputes or ambiguities in the factual record in favor of the plaintiff—determined that plaintiff's complaint complied with Rule 9(j) in that plaintiff reasonably expected her proffered expert to qualify under Rule 702. *Id.* at 35, 726 S.E.2d at 819–20. The Court expressed no opinion on whether the plaintiff's expert would actually qualify under Rule 702 and "note[d] that, having satisfied the Rule 9(j) pleading requirements, plaintiff has survived the pleadings stage of her lawsuit and may, at the trial court's discretion, be permitted to amend the pleadings and proffer another expert" in the

event that her proffered expert later failed to qualify under Rule 702. *Id.* at 36, 726 S.E.2d at 820.

While the Rule 9(j) issue in *Moore* arose in the context of a motion for summary judgment and focused specifically on whether the plaintiff's expert was reasonably expected to qualify as an expert witness, we conclude that the analytical framework set forth in *Moore* applies equally to other Rule 9(j) issues in which "a complaint facially valid under Rule 9(j)" is challenged on the basis that "the certification is not supported by the facts." *Id.*, 366 at 31–32, 726 S.E.2d at 817 (citing *Barringer*, 197 N.C. App. at 255, 677 S.E.2d at 477). For instance, where, as here, a defendant files a motion to dismiss under Rule 12(b)(6) challenging a plaintiff's facially valid certification that the reviewing expert was willing to testify at the time of the filing of the complaint, the trial court must examine " 'the facts and circumstances known or those which should have been known to the pleader' at the time of filing," *id.* at 31, 726 S.E.2d at 817 (quoting *Trapp*, 129 N.C. App. at 241, 497 S.E.2d at 711), and "to the extent there are reasonable disputes or ambiguities in the forecasted evidence, the trial court should draw all reasonable inferences in favor of the nonmoving party at this preliminary stage," *id.* at 32, 726 S.E.2d 817–18 (citations omitted). "When the trial court determines that reliance on disputed or ambiguous forecasted evidence was not reasonable, the court must make written findings of fact to allow a reviewing appellate court to determine whether those findings are supported by competent evidence." *Id.* at 32, 726 S.E.2d at 818 (citations omitted).

We stress that Rule 9(j) is unique and that because the evidence must be taken in the light most favorable to the plaintiff, the nature of these "findings," and the "competent evidence" that will suffice to support such findings, differs from situations where the trial court sits as a fact-finder. We do not view the legislature's enactment of Rule 9(j) as intending for the trial court to engage in credibility determinations and weigh competent evidence at this preliminary stage of the proceedings. *See id.* at 31, 726 S.E.2d at 817 (stating that Rule 9(j) "operates as a preliminary qualifier to 'control pleadings' rather than . . . as a general mechanism to exclude expert testimony" (citing *Thigpen*, 355 N.C. at 203–04, 558 S.E.2d at 166)); *see also State v. Dew*, 225 N.C. App. 750, 760, 738 S.E.2d 215, 222 (2013) ("[T]he credibility of and weight to be given to the expert's testimony is a question for the jury rather than the trial court." (citing *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 460–61, 597 S.E.2d 674, 687–88 (2004))). Thus, it is erroneous to conclude, as the Court of Appeals did here with respect to the trial court's findings regarding Dr. Toporoff's willingness to testify, that a Rule 9(j) "finding" "supported by competent evidence [is] binding on the appellate courts even if the evidence would support a contrary finding." *Preston*, 825 S.E.2d at 662 (quoting *Scott*, 336 N.C. at 291, 442 S.E.2d at 497).

Defendant here agrees that *Moore* supplies the appropriate standard for evaluating plaintiff's compliance with Rule 9(j) but nevertheless contends that the factual record clearly demonstrates Dr. Toporoff's unwillingness to testify such that there is no *reasonable* dispute or ambiguity in the evidence. Defendant argues that

the evidence establishes that Dr. Toporoff was not willing to testify unless plaintiff retained a nuclear cardiologist and that plaintiff did not retain a nuclear cardiologist at the time of the filing of the Second Complaint. Thus, defendant contends that the trial court's finding that Dr. Toporoff was not willing to testify at the time of filing was supported by the evidence and the trial court's conclusion that plaintiff's complaint failed to comply with Rule 9(j) was supported by the findings.

On the other hand, plaintiff argues that the trial court mistakenly interpreted evidence of Dr. Toporoff's unwillingness to testify against defendant at the time of the First Complaint as evidence that he was unwilling to testify against defendant at the time of the Second Complaint (in which defendant was added to the lawsuit) and also failed to apprehend that a "nuclear stress test" contains separate and distinct parts: (1) the EKG treadmill test, about which Dr. Toporoff is undisputedly qualified to testify; and (2) interpretation of the nuclear images. According to plaintiff, taking the evidence in the light most favorable to plaintiff, the factual record clearly demonstrates that after receiving new information in Dr. Doctor's Answer following the filing of the First Complaint, Dr. Toporoff was willing at the time of the filing of the Second Complaint to testify against defendant without the need for any nuclear cardiologist on the basis that defendant failed to meet the standard of care as a cardiologist interpreting a treadmill stress test—specifically, by failing to accurately interpret and document the EKG treadmill test, failing to timely and effectively

communicate the results to the hospitalist, and failing to recommend a cardiac consult prior to Mr. Preston's discharge.

We conclude that taking the evidence in the light most favorable to plaintiff, including Dr. Toporoff's affidavits and his deposition testimony, the factual record clearly supports a reasonable inference that at the time of the filing of the Second Complaint Dr. Toporoff was willing to testify that defendant failed to comply with the applicable standard of care as a cardiologist.

Here, plaintiff's compliance with Rule 9(j) is measured at the time of the filing of the Second Complaint on 12 February 2016, as that was when Dr. Movahed was added as a defendant in the action. *See Moore*, 366 N.C. at 31, 726 S.E.2d at 817 ("[C]ompliance or noncompliance with the Rule is determined at the time of filing." (citations omitted)). In his Second Affidavit, submitted at the time of the filing of the Second Complaint, Dr. Toporoff averred that:

> [I]t is my opinion that medical care provided to William Preston during his admission to Vidant Medical Center on February 3 – 4, 2014 for chest pain, failed to comply with the applicable standard of care for the evaluation of a patient with chest and arm pain who presented with Mr. Preston's signs, symptoms and medical history. I first expressed this opinion to Ms. Armstrong on August 1, 2015 and I provided additional opinion on September 20, 2015, on October 28, 2015 and on February 9, 2016. I have expressed my willingness to testify to the above if called upon to do so.

The ambiguity in Dr. Toporoff's willingness to testify involves his deposition testimony. In Dr. Toporoff's 23 March 2017 deposition, he had difficulty remembering

when he formed his opinions of defendant. Dr. Toporoff testified that he had not formulated any opinions regarding defendant prior to the First Complaint in 2015, explaining that he told plaintiff he was unwilling to testify against defendant unless she retained a nuclear cardiologist:

> A: It's coming back to me. I think I had always been critical of Dr. Movahed and I told [plaintiff's counsel] that I did not feel competent in criticizing him because I knew what would happen in the sense that he would put up these images and I would look like a fool trying to interpret the images.
>
> And I believe I said to her I would not add him to my lawsuit unless she got another nuclear cardiologist to interpret the images. I did not want to get into an across-the-table where he is highly competent in that field on paper and I have no business criticizing his summaries.
>
> Q. Because you're not qualified as –
>
> A. Correct.
>
> Q. – a nuclear cardiologist?
>
> A. That's how his name got added later. I refused to be a nuclear cardiologist against him.
>
> Q. Sure.
>
> A. That, I think, is what happened.
>
> Q. Because you're not a nuclear cardiologist?
>
> A. Absolutely.
>
> Q. So it would be inappropriate for you to render any opinions –

A.    Right.

Q.    – regarding Dr. Movahed because of that.

A.    But that's why his name was left out the first time.

At different points later in the deposition, Dr. Toporoff testified:

A.    At the beginning, I just wanted to make it clear, because I remember a conversation I had with [Plaintiff's attorney], that I would not testify against Dr. Movahed unless she came up with a nuclear cardiologist because I did not want to be across from him where he's talking about nuclear images and I have to say, I know nothing. And once we agreed that she would get somebody else, then I felt I could handle myself clinically.

. . . .

Q.    I think you said earlier that you initially did not feel competent to give testimony as to Dr. Movahed, but you told [plaintiff's counsel] that if she got a nuclear guy, then you would feel competent to give testimony and I'm not sure I understood why you said that.

A.    I anticipated that if it were just my testimony against [defendant], he would say I had no business in making any judgment about his readings and what he does with them, and he would be completely correct.

But once I didn't have to worry about anything about looking at this doughnut hole [the nuclear images] and what do you think of it, then I felt much, much more comfortable because it was a clinical situation purely.

Q.    All Right.  So you had opinions separate and apart from the NST images, but you didn't feel as confident expressing those until you had some kind –

A.    Correct.

Q. -- of support for the NST images as well?

A. Correct.

While this testimony is ambiguous as to whether Dr. Toporoff's condition that

plaintiff retain a nuclear cardiologist continued beyond the time of the filing of the

First Complaint, the testimony still appears to be focused on the time period prior to

the filing of the First Complaint (i.e. "at the beginning") and in it Dr. Toporoff

expressed his concern that his criticisms of defendant were not sufficiently distinct

from defendant's interpretation of the nuclear images such that he was willing to

testify against defendant as a "cardiologist" at that time—as Dr. Toporoff put it, he

"refused to be a nuclear cardiologist against him." Significantly, we note that later

in the deposition Dr. Toporoff testified as follows regarding the time of the filing of

the Second Complaint when he submitted his Second Affidavit:

> Q. And going back [to] your testimony about your opinions about Dr. Movahed in this case, you explained to [defendant's counsel] on the record that you were not comfortable testifying as to the nuclear imaging interpretation by Dr. Movahed.
>
> Were you comfortable and do you remain comfortable at the time – *at this time when you did the 9(J) affidavit*, [emphasis added] were you comfortable saying that Dr. Movahed failed to meet the standard of care *as it applies to a cardiologist* [emphasis added] interpreting a treadmill stress test?
>
> A. Yes.

This "cardiologist" distinction is significant as a full reading of Dr. Toporoff's deposition, along with Dr. Toporoff's third affidavit, taken in the light most favorable to plaintiff clearly supports the inference urged by plaintiff—that the nature of Dr. Toporoff's opinions concerning defendant significantly changed when, following the filing of the First Complaint, he realized that Dr. Movahed's written report of the nuclear stress test, which had been included in the medical files that he previously reviewed, had not actually been included in Mr. Preston's medical chart—and therefore was not seen by Dr. Doctor—until after Mr. Preston was discharged from the hospital.

Dr. Toporoff testified that he first reviewed defendant's involvement in the case when he received the medical files in 2015 prior to the filing of the First Complaint, stating that "you couldn't not see it when you were reviewing the entire case" and that he "didn't understand why [defendant's] report had not commented on two important issues during the nuclear study, namely the fact that the man had chest pain on the treadmill and that there were EKG changes that were either ignored or not noticed." Thus, at the beginning Dr. Toporoff was critical of defendant's report as it related to Mr. Preston's chest pain and the EKG tracings from the exercise portion of the stress test. Dr. Toporoff noted that he "do[es] about 250 to 300 treadmills a year" and explained that two of the ways you can "flunk" a stress test are "if the test provokes chest pain" and if "EKG changes during the treadmill worsened . . . and fulfilled the criteria for a positive exercise treadmill test for myocardial ischemia."

Dr. Toporoff was also critical of the report's suggestion that "one may consider a CTA," a type of angiogram he described as an outpatient procedure that in most cases is "a week or two down the line, as it was in this case." This was the "wrong test," according to Dr. Toporoff, as Mr. Preston needed an immediate "cardiologist consult," which "would have led to a cardiac catheterization which is the test that he really needed."

According to Dr. Toporoff, the plan from the physician ordering the test was that if the nuclear stress test was normal, Mr. Preston would be discharged, and in his view the "stress test was clearly not normal":

> A.     The treadmill test was, in my judgment, completely abnormal and consistent with myocardial ischemia. And he thought -- he indicated in the exercise physiology portion that he didn't see any abnormality. I think he was wrong.
>
> Similarly, the chest pain on the treadmill is a very important clinical feature that he did not mention in his final impression.

However, Dr. Toporoff acknowledged that the phrase "chest pain during exercise" was included in the report, that the report did not rule out ischemia, and that the report did not characterize the test as "normal."

Significantly, much of Dr. Toporoff's criticism was reserved not for the report itself, but on the fact that this report was not made available until after Mr. Preston's discharge, and that in its place defendant failed to effectively communicate the significance of the results of the test to the attending doctor, Dr. Doctor. Dr. Toporoff

testified that Mr. Preston's death was caused by a "breakdown of the whole system," that he "shouldn't have gone home," and that it started with defendant. According to Dr. Toporoff:

> A.      Well, it starts off with that Dr. Joshi is in his second day as a nuclear cardiology fellow, . . . . And in this particular week or day he was assigned to Dr. Movahed.
>
> Of all the people who read nuclear cardiology tests, it appears that they either typed their own reports right into the electronic medical record.
>
> . . . . Dr. Movahed is the only one who dictated his report, which means the hospital has to hire a transcriptionist and that report does not appear in the chart until the following day.
>
> . . . . [H]e doesn't call the doctor. He assigns Dr. Joshi on his second day to explain the nuclear findings to, in this case, Dr. Doctor because she was the hospitalist of record.

Dr. Toporoff stated that the "report hit the chart February 5th at about 8:30 in the morning . . . and the patient was long gone," and that the "patient was discharged before the report was in the chart and I think [that] was instrumental in allowing Mr. Preston to die." Dr. Toporoff further explained:

> A.      Let me amplify. If you're dealing with an outpatient procedure, the guy isn't that sick, he comes in. I'm not going to say that every one at our hospital is ready the same day. You can do it a day or two later. Maybe it's not great medicine, but it's nothing terrible. But when a guy comes in through the emergency room and you rule out MI and he's having chest discomfort, that report should be available that same day.

Q.      And this is a report by a nuclear cardiologist?

A.      Yes.

Q.      Which you are not?

A.      I don't think it matters whether I am or not. I know when a report should be due.

In Dr. Toporoff's view, given the information that defendant possessed, "especially since he knows when that report is going to be available on the computer, I think he should have picked up the telephone himself and called Dr. Doctor and said, You have a problem there. I would get the consulting service to see this patient." As Dr. Toporoff put it, "to have a nuclear cardiology report that's abnormal, you can't just dictate it and walk away. That's wrong."

Further, Dr. Toporoff opined that it would not have been appropriate to delegate such a task to Dr. Joshi, stating "[w]hen a test is that abnormal, I think the physician of record should take no chances and should speak to the doctor himself personally." In that respect, Dr. Toporoff noted that Dr. Joshi's note, which *was* added to the medical chart and received by Dr. Doctor before Mr. Preston's discharge, made no mention of the fact that Mr. Preston experienced chest pain during the treadmill test or of any ST abnormalities.

Thus, a significant portion of Dr. Toporoff's criticism of defendant's conduct was based not on the report that he received with the medical records back in 2015 but rather on the fact that the report was not made available to the attending

hospitalist prior to Mr. Preston's discharge. As such, it reasonable to infer that while Dr. Toporoff was unwilling to testify against defendant purely on the basis of the report, part of which he acknowledged he was not qualified to address (the nuclear images) and other portions of which he was critical but also conceded did not characterize the nuclear stress test as normal, he was willing to testify that defendant's failure to submit the report or otherwise communicate the results of the test to the hospitalist was a breach of the standard of care as a cardiologist.

Dr. Toporoff clarified his opinions in his Third Affidavit submitted on 15 September 2017, in which he averred:

> 5) In November of 2015, I signed an Expert Witness Affidavit regarding the hospitalist physicians. Around that time, I communicated to [plaintiff's counsel] that I did not have sufficient information to say that Dr. Movahed and/or Dr. Joshi had clearly violated any standards of care.
>
> 6) In February of 2016, I again spoke with [plaintiff's counsel], who informed me that she had received additional information through discovery answers served by Vidant Medical Center and Dr. Neha Doctor[6] regarding the communication of Mr. Preston's stress tests results by Drs. Movahed and Joshi.
>
> 7) Based on the representation by Dr. Doctor in those documents of the following information: that Dr.

---

[6] Dr. Doctor's answer stated:

> [I]t is admitted that the medical records of Mr. Preston contain a report of the nuclear stress test which appears to have been prepared by Dr. Movahed, that this is a written document, which speaks for itself and is the best evidence of what is contained in the report, but it is denied that this written report was available to this Defendant at the time she provided care to Mr. Preston.

Movahed's report was NOT available to her prior to Mr. Preston's discharge; that Dr. Movahed had specifically made recommendations to the hospitalists, and that Dr. Joshi communicated the results of the nuclear stress test with "cardiology's" recommendation for an outpatient CT angiogram, I informed Ms. Armstrong I was willing to testify that Dr. Movahed and Dr. Joshi violated standards of care in their collaboration and treatment of Mr. Preston.

8) My criticisms of Drs. Movahed and Joshi include: failures to interpret, diagnose, document and communicate to the ordering physician the presence of chest pain and ST wave depression changes during Mr. Preston's nuclear treadmill stress test that were consistent with ischemia, and failure to recommend an immediate cardiology consult for Mr. Preston prior to his discharge. These are violations of the standard of care.

9) Since my review of the totality of these medical records and documents in February of 2016, I have held these opinions. I expressed my willingness to testify regarding the standard of care that applied to Drs. Movahed and Joshi in their treatment and care of Mr. Preston to Ms. Armstrong in a phone call on February 12, 2016.

In viewing the evidence in the light most favorable to plaintiff, we conclude that the evidence does not support the trial court's findings that "Dr. Toporoff only agreed to testify in the Second Lawsuit if Plaintiff's counsel retained a nuclear cardiologist" and that "as of the date the Second Lawsuit was filed, Plaintiff had no cardiologist competent or willing to testify against . . . Dr. Movahed."[7] Rather, the

---

[7] We conclude that the trial court's Finding 22 ("Dr. Toporoff . . . admitted that Dr. Movahed's involvement was limited to the interpretation of the nuclear stress test that was performed on Mr. Preston.") is supported by the evidence. In his deposition, Dr. Toporoff agreed with this statement; his opinion was that defendant, having been assigned to interpret the nuclear stress test, breached the standard of care by failing to accurately interpret it and communicate its results.

factual record demonstrates that Dr. Toporoff was willing to testify against defendant at the time of the filing of the Second Complaint. At a bare minimum, we are certain that any ambiguity in the evidence is not so unreasonable such that it should be resolved against plaintiff and result in a finding that plaintiff was unreasonable in her Rule 9(j) certification that Dr. Toporoff was willing to testify against defendant at the time of the filing of the Second Complaint. Thus, the trial court's conclusion that plaintiff failed to comply with the requirements of Rule 9(j) is unsupported by its findings to the extent that it is based on plaintiff's reviewing expert's purported unwillingness to testify against defendant.

The trial court also determined that plaintiff could not have reasonably expected that Dr. Toporoff would qualify as an expert witness, an issue the parties briefed in the Court of Appeals and before this Court. We hold that at the relevant time, again taking the evidence in the light most favorable to plaintiff, plaintiff's expectation that Dr. Toporoff would qualify as an expert to testify in this case was reasonable.

In that respect, we note that in declining to address whether plaintiff reasonably expected Toporoff to qualify under Rule 702, the language of the Court of Appeals suggested—though it is unclear—that the court was declining to address a question of whether Dr. Toporoff would *actually* qualify under Rule 702. *See Preston*, 825 S.E.2d at 664 (stating that "we need not address the sufficiency of evidence supporting that part of the finding as to whether Dr. Toporoff was competent to testify

in any capacity against Dr. Movahed" and that Rule 9(j) prevents "any filing in the first place by a plaintiff who is unable to procure an expert who *both* meets the appropriate qualifications and . . . is willing to testify" (quoting *Vaughan*, 371 N.C. at 435 817 S.E.2d at 375)). We reiterate in the interest of clarity that under Rule 9(j) "the preliminary, gatekeeping question of whether a proffered expert witness is 'reasonably expected to qualify as an expert witness under Rule 702' is a different inquiry from whether the expert *will actually* qualify under Rule 702." *Moore*, 366 N.C. at 31, 726 S.E.2d at 817 (citing N.C.G.S. § 1A-1, Rule 9(j)(1)). Further, "to the extent there are *reasonable* disputes or ambiguities in the forecasted evidence, the trial court should draw all reasonable inferences in favor of the nonmoving party at this preliminary stage of determining whether the party *reasonably expected* the expert witness to qualify under Rule 702," and "a finding that reliance on a fact or inference is not reasonable will occur only in the rare case in which no reasonable person would so rely." *Id.* at 32, 726 S.E.2d at 818 (citations omitted).

The standards articulated in *Moore* apply here. As summarized in that case, under Rule 702(b), there is a three-part test to qualify as an expert witness:

> (1) whether, during the year immediately preceding the incident, the proffered expert was in the same health profession as the party against whom or on whose behalf the testimony is offered; (2) whether the expert was engaged in active clinical practice during that time period; and (3) whether the majority of the expert's professional time was devoted to that active clinical practice.

*Moore v. Proper*, 366 N.C. at 33, 726 S.E.2d at 818 (footnote omitted). The record in this case establishes that like Dr. Movahed, Dr. Toporoff is board-certified in internal medicine and cardiovascular disease. During the relevant time period, and, in fact, for over forty years, Dr. Toporoff has practiced as a cardiologist, engaged in active clinical practice treating patients like Mr. Preston. As part of this clinical work, Dr. Toporoff interprets hundreds of treadmill tests every year, and the treadmill test is the portion of the stress test relevant to the opinions Dr. Toporoff would testify to at trial. There is no dispute that the majority of Dr. Toporoff's professional time was devoted to his active clinical practice. As such, this is not "the rare case" in which plaintiff's reliance was unreasonable. *Id.* at 31, 726 S.E.2d at 818.

Defendant takes the position that because Dr. Toporoff is not a nuclear cardiologist and Dr. Movahed does have that specialized expertise, Dr. Toporoff could not qualify to testify against Dr. Movahed. However, throughout the record as developed so far, Dr. Toporoff has been clear that he is not purporting to offer expert opinions about the nuclear imaging portion of the stress. The rule only requires that an expert witness have experience performing the procedure that is the subject of the complaint and treats similar patients, not that both the defendant and the testifying witness have the exact same professional qualifications. Just as a dentist can testify as an expert on the standards of care relevant to extracting a tooth in a case where the procedure at issue was actually performed by an oral and maxillofacial surgeon, a cardiologist who annually interprets hundreds of treadmill tests can testify about

the standards of care relevant to treadmill tests in a case where the treadmill test results were not properly handled by a nuclear cardiologist. *See, e.g., Roush v. Kennon,* 188 N.C. App. 570, 575–76, 656 S.E.2d 603, 607 (2008). Rule 9(j) is intended as a gatekeeping rule to prevent the prosecution of frivolous malpractice claims, not an endless maze of impossible hurdles to bar juries from hearing meritorious cases. *Moore,* 366 N.C. at 31, 726 S.E.2d at 817.

Here plaintiff satisfied her Rule 9(j) responsibility by obtaining the opinion of a doctor who she reasonably expected to meet the three-part test for qualification under Rule 702(b) on the question of whether defendant violated the standard of care for cardiologists in reading Mr. Preston's exercise treadmill stress test and EKG recordings and communicating those results to Mr. Preston's ordering physicians.

Conclusion

In sum, we conclude that the trial court and the Court of Appeals erred in failing to view the factual record in the light most favorable to plaintiff. The trial court's findings that Dr. Toporoff was not willing to testify at the time of the filing of the Second Complaint are not supported by the evidence. The affidavits and Dr. Toporoff's deposition testimony demonstrate that after receiving new information in Dr. Doctor's answer, Dr. Toporoff was willing to testify at the time of the filing of the Second Complaint that defendant breached the standard of care. Further, it was reasonable for the plaintiff to conclude that Dr. Toporoff's clinical practice as a cardiologist likely qualified him under Rule 702(b) to express expert opinions

concerning Mr. Preston's treadmill test. This complaint should not be dismissed on Rule 9(j) grounds. We reverse the Court of Appeals and remand for further proceedings.

REVERSED AND REMANDED.

Justice NEWBY dissenting.

The issue in this case is the standard by which an appellate court reviews a trial court's dismissal of a complaint for noncompliance with N.C.G.S. § 1A-1, Rule 9(j) (2019). In *Moore v. Proper*, this Court held that when a trial court dismisses a claim because it does not comply with Rule 9(j), appellate courts only ask whether competent evidence in the record supports the trial court's findings of fact and those facts support its decision. 366 N.C. 25, 32, 726 S.E.2d 812, 818 (2012). The majority purports to clarify that standard from *Moore*, but in fact upends it altogether, replacing *Moore*'s appellate deferential standard of review with a de novo standard used to address summary judgment motions. It thus improperly converts this Court into a factfinder, removing that task from the trial court and subverting the trial court's role as gatekeeper. Because the majority removes this critical and historic role from the trial court, it undermines the legislative purpose of Rule 9(j) to properly screen medical malpractice cases.

The trial court determined that a clinical cardiologist was neither willing to testify nor reasonably expected to qualify to testify against an experienced nuclear cardiologist whose sole involvement in the case was the interpretation of a nuclear stress test. The clinical cardiologist by his own admission has not performed a nuclear stress test and cannot interpret nuclear stress test images. The question in this case is whether this Court should overrule the trial court's factually supported decision.

The majority disregards the trial court's findings because it both misconstrues the facts and ignores the proper standard of review. It therefore undermines Rule 9(j) and Rule 702 by ignoring the requirement that testimony against specialists must come from like specialists, and instead effectively says "any doctor will do." Because the trial court correctly granted the motion to dismiss, its decision should be upheld. I respectfully dissent.

The General Assembly enacted Rule 9(j) to establish trial courts as gatekeepers in medical malpractice actions. Rule 9(j) provides that any medical malpractice action "shall be dismissed unless" the plaintiff's medical records and care "have been reviewed by a person" who is (1) "reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence," and (2) "willing to testify that the medical care did not comply with the applicable standard of care." N.C.G.S. § 1A-1, Rule 9(j)(1). The General Assembly passed these requirements to ensure that experts in medical malpractice actions would be "qualified practitioners of a competence similar to those of the practitioners who are the object of the suit." Minutes, *Meeting on H. 636 & H. 730 Before the House Select Comm. on Tort Reform*, 1995 Reg. Sess. (Apr. 19, 1995).

Rule 9(j) thus requires courts to consider whether a witness is reasonably expected to qualify to testify under Rule 702. Rule 702 allows expert testimony only if the witness has specialized knowledge through experience or other training, and: (1) the testimony is based on sufficient facts or data, (2) the testimony is the product

or reliable principles and methods, and (3) the witness has applied those principles and methods reliably to the facts of the case. For medical malpractice actions specifically, Rule 702 explains that if the defendant is a specialist, "a person *shall not give expert testimony* [against the defendant] on the appropriate standard of health care" unless the prospective witness "[s]pecialize[s] in the *same specialty* as the [defendant]; or [s]pecialize[s] in a similar specialty which includes within its specialty *the performance of the procedure that is the subject of the complaint* and ha[s] prior experience treating similar patients." N.C.G.S. § 8C-1, Rule 702(b)(1)(a), (b) (2019) (emphases added).

Thus, for a plaintiff to satisfy Rule 9(j), at the time she filed her complaint she must have retained a witness willing and competent to testify as to the specific specialized procedures involved in the defendant's medical care. By requiring such a showing, "[t]he legislature's intent was to provide a more specialized and stringent procedure for plaintiffs in medical malpractice claims through Rule 9(j)'s requirement of expert certification prior to the filing of a complaint." *Thigpen v. Ngo*, 355 N.C. 198, 203–04, 558 S.E.2d 162, 166 (2002).

This Court, in *Moore*, described how courts should address motions to dismiss under Rule 9(j). It first spoke to the role of trial courts. In determining whether a claim complies with Rule 9(j), this Court said, "the trial court must look to all the facts and circumstances that were known or should have been known by the [plaintiff] at the time of filing." 366 N.C. at 32, 726 S.E.2d at 818. The trial court can consider

evidence outside of the plaintiff's affidavit, including evidence which comes to light after the affidavit is filed. *Id.* at 31, 726 S.E.2d at 817. This Court explained that if "there are *reasonable* disputes or ambiguities in the forecasted evidence, the trial court should draw all reasonable inferences in favor of the nonmoving party at this preliminary stage of determining whether the party *reasonably expected* the expert witness to qualify under Rule 702." *Id.* at 32, 726 S.E.2d at 818. Though only in the "rare case" will "the trial court determine[ ] that reliance on disputed or ambiguous forecasted evidence was not reasonable," in such a case "the court must make written findings of fact . . . ." *Id.* at 32, 726 S.E.2d at 818. *Moore* thus recognized the unique capacity of the trial court as factfinder, directing that court to weigh reasonably disputed evidence in favor of the nonmoving party, but recognizing the trial court may determine in some cases that reliance on disputed or ambiguous forecasted evidence is unreasonable.

*Moore* then explained the distinct role of appellate courts on appeal of a trial court's Rule 9(j) dismissal. First, an appellate court must determine whether the trial court's factual findings are supported by "competent evidence." *Id.* at 32, 726 S.E.2d at 818. Second, if the factual findings are supported by competent evidence, the appellate court must determine whether the findings support the trial court's conclusion that the complaint failed to comply with Rule 9(j). *Id.* Thus, though *Moore* requires *trial courts* to construe reasonably disputed evidence in the plaintiff's favor, it directs appellate courts to uphold trial courts' dismissals under a deferential

standard—when competent evidence can be found to support the decision.

This is the second of two lawsuits filed by plaintiff.[1] The current action was filed against Dr. Movahed, Dr. Joshi, and the hospital. Doctor Movahed is a board-certified nuclear cardiologist, the head of his department, and an instructor of nuclear cardiology fellows. Doctor Joshi was a clinical cardiologist seeking to become board certified in nuclear cardiology and therefore was working as a fellow under Dr. Movahed. The defendants moved to dismiss the claims for failure to comply with Rule 9(j). In response to the motion, plaintiff argued that Dr. Toporoff was qualified and willing to criticize Dr. Movahed at the time the lawsuit was filed.

With this background, the trial court dismissed plaintiff's complaints against all the defendants for noncompliance with Rule 9(j). Regarding Dr. Movahed, it found the following: that "Dr. Toporoff admitted that he is not a nuclear cardiologist, and has never interpreted nuclear stress tests"; that "Dr. Toporoff also testified that he had no business criticizing and did not feel competent criticizing Dr. Movahed's interpretation of the [nuclear stress test]"; and that "Dr. Toporoff only agreed to testify in the [lawsuit against Dr. Movahed] if Plaintiff's counsel retained a nuclear cardiologist." The court thus concluded as a matter of law that plaintiff's complaint failed to comply with Rule 9(j) because at the time of filing the lawsuit plaintiff had

---

[1] The first action was filed against several hospital defendants and the hospitalists, including Dr. Prodduturvar and Dr. Doctor.

no expert competent and willing to testify against the defendants.[2]

The Court of Appeals agreed with the trial court, reaching only the issue of Dr. Toporoff's willingness to testify. It properly performed its appellate role as set out in *Moore*, holding that the trial court's finding that Dr. Toporoff was not willing to testify against Dr. Movahed at the time the complaint was filed was supported by competent evidence. *Preston v. Movahed*, 825 S.E.2d 657, 665 (N.C. Ct. App. Mar. 5, 2019).

Applying the standard of review set out by *Moore*, this Court should affirm the trial court's dismissal of plaintiff's claim for noncompliance with Rule 9(j). The evidence in this case shows that at the time the complaint was filed, plaintiff could not have reasonably expected Dr. Toporoff to qualify to testify against Dr. Movahed regarding either the interpretation of the nuclear stress or the communication of the test results, and that Dr. Toporoff was not willing to do so.

Doctor Toporoff was neither able nor willing to testify regarding Dr. Movahed's interpretation of the nuclear stress test as a whole. Doctor Toporoff's testimony shows that he is not a nuclear cardiologist like Dr. Movahed, that he understood that Dr. Movahed's only role in the case was to interpret the decedent's nuclear stress test, that he does not interpret nuclear cardiology images like those generated by the nuclear stress test, and that he does not feel competent to do so. Doctor Toporoff

---

[2] Plaintiff appealed and subsequently settled with the hospital and Dr. Joshi, leaving only the action against Dr. Movahed.

explained that before the action was filed, he likely told plaintiff that he would not comment on the nuclear stress test images but would only comment on the "review of the summary" of Dr. Movahed's report, as well as Dr. Movahed's communication of that report. He then explained that he told plaintiff he would not testify against Dr. Movahed at all unless plaintiff also retained a nuclear cardiologist to interpret the nuclear stress test images. Indeed, he admitted that he "ha[d] no business criticizing [Dr. Movahed's] summaries" of nuclear stress test images.

Rule 702(b)(2)(a) specifically requires an expert witness to have the same or substantially the same specialty as the defendant against whom the witness intends to testify. Doctor Movahed's role was limited to the interpretation of the nuclear stress test, a role that includes interpreting nuclear stress test images, which Dr. Toporoff admitted he cannot do. Doctor Toporoff also admitted that he is not, and never has been, a nuclear cardiologist. Clearly plaintiff should have been aware that a clinical cardiologist like Dr. Toporoff would not qualify to testify against a nuclear cardiologist regarding a nuclear stress test that only a nuclear cardiologist is able to interpret. Understanding Dr. Toporoff's limitations and his express concerns, plaintiff did eventually identify two nuclear cardiologists willing to serve as expert witnesses. But neither of them had reviewed the medical care at issue at the time of the filing of the complaint against Dr. Movahed. Plaintiff therefore should have been aware at time of filing that a nuclear cardiologist would be required to testify against another nuclear cardiologist whose involvement was limited to the interpretation of

the nuclear stress test. However, at the time the complaint was filed, plaintiff did not have a nuclear cardiologist willing to testify.

Plaintiff nevertheless argues that, despite the unified nature of reading a nuclear stress test, the interpretation of the test can be broken into its component parts and criticized piecemeal. Thus, plaintiff asserts that a nuclear cardiologist is not necessary to criticize the care of another nuclear cardiologist. This approach is exactly what Rule 9(j) and Rule 702 are intended to prevent. It violates the plain language of Rule 702 which requires a specialist with the same subspecialty who is familiar with the procedure. Whether a test conducted by a specialist can be broken into component parts and criticized in this manner itself requires an expert in that field rendering that opinion. It is not something that a court can simply find without expert testimony.

Specifically, plaintiff contends that Dr. Toporoff was willing and qualified to testify as to the EKG portion of the treadmill test. A clinical cardiologist, however, is not qualified to criticize how a nuclear cardiologist should utilize an EKG in isolation from the nuclear images. The majority concedes that Dr. Movahed's involvement in this case was limited to the interpretation of the nuclear stress test only. And, as Dr. Toporoff concedes, the nuclear stress test involves reading together both the treadmill EKG and the nuclear imaging. Therefore, a complete interpretation of a nuclear stress test requires an understanding of the integration of both of these components. If Dr. Toporoff could not testify regarding an essential component of that test, the

nuclear images, plaintiff could not reasonably believe his testimony would likely "assist the trier of fact to understand the evidence or to determine a fact in issue" as Rule 702 requires. *See* N.C.G.S. § 8C-1, Rule 702(a). Of course, Dr. Toporoff's own testimony supports this conclusion, as he said he would not feel comfortable testifying even about the EKG portion of the test unless plaintiff retained an expert to testify to the nuclear imaging portion as well. Doctor Toporoff's reluctance to testify on this point goes hand in hand with the unlikelihood of his qualifying to do so; he did not want to testify against Dr. Movahed unless a nuclear cardiologist did as well because, in Dr. Toporoff's words, "I did not want to get into an across-the-table where [Dr. Movahed] is highly competent in that field on paper and I have no business criticizing his summaries."

Finally, Dr. Toporoff was not in a position to testify regarding Dr. Movahed's communication of the nuclear stress test results. For nuclear stress tests, typically the primary care doctor is the one who orders the test, and only does so once he or she rules out acute coronary artery syndrome. The nuclear cardiologist is not present when the nuclear stress test is conducted. The nuclear cardiologist's only role is to later interpret the results of the nuclear stress test, which, as Dr. Movahed has explained, involves "just sitting in a dark room reading the nuclear." Once he has interpreted the nuclear stress test, which Dr. Toporoff cannot do, the results are communicated to the hospitalist. In this case, consistent with the school's protocol for teaching physicians, he communicated the results of the nuclear stress test to Dr.

Joshi while he instructed him on how to interpret the nuclear stress test images. The standard practice, Dr. Movahed explained, is that, as part of the nuclear cardiology training, the fellow communicates the test results to the hospitalist—the physician in charge of the patient. The hospitalist sets up any additional visits and testing with the patient. Doctor Movahed testified that when he communicates his results to the fellow, he typically recommends that, in cases of an abnormality like the decedent's, a CTA be conducted on the patient immediately after discharge from the hospital.

Doctor Toporoff admitted that he is not critical of the role of Dr. Joshi. Thus, if Dr. Toporoff is critical of the method of communication, he is critical of the communication protocol, not of Dr. Movahed. Plaintiff, however, has not put forth evidence that Dr. Toporoff is competent to testify about a nuclear cardiologist's communication protocol in this teaching hospital. Doctor Toporoff has no special knowledge about whether nuclear stress test results should be communicated to a nuclear cardiology fellow, to the hospitalist, or to someone else. It is not enough simply to state that Dr. Toporoff is a cardiologist. At the very least, plaintiff must provide a witness who is familiar with proper communication protocols for nuclear cardiologists operating in the role of teaching physician; and plaintiff did not do so.

Competent evidence thus supports the trial court's conclusion that plaintiff had provided no witness willing to testify against Dr. Movahed and reasonably expected to qualify to do so. Doctor Toporoff, as a clinical cardiologist, was in no place to criticize Dr. Movahed's interpretation of the nuclear stress test or Dr. Movahed's

communication of that interpretation. Doctor Movahed is well-versed in a narrow specialty in which Dr. Toporoff does not have experience. Testimony from such a person is of the exact sort the General Assembly hoped to screen out when it enacted Rule 9(j).

The majority goes astray from the very foundation of its analysis because it upends the standard of review this Court established in *Moore*. Its approach places the appellate court into the role of the trial court. If this Court in *Moore* intended the appellate court to review de novo the trial court's dismissal, it would have said so. Indeed, if the majority were right that appellate courts can simply find their own facts to overrule trial courts' Rule 9(j) decisions, that begs the question of why this Court in *Moore* required trial courts to make factual findings and conclusions of law at all. The appellate courts would only need a trial court record to review.

Instead, *Moore* instructed appellate courts to operate under a deferential standard. It said that in the rare case in which the plaintiff's reliance on disputed or ambiguous evidence was unreasonable, "the [trial] court must make written findings of fact to allow a reviewing appellate court to determine whether those findings are supported by competent evidence, whether the conclusions of law are supported by those findings, and, in turn, whether those conclusions support the trial court's ultimate determination." 366 N.C. at 32, 726 S.E.2d at 818. *Moore*'s approach comports with the underlying intent of Rule 9(j) to screen frivolous and unsupported medical malpractice suits. The rule cannot meaningfully accomplish this purpose

unless trial courts may weigh the facts to determine whether the two central requirements of the rule are satisfied.

By upending the *Moore* standard, the majority removes the trial court from its gatekeeping function, reassigning that role to the appellate court, finding its own facts and ignoring the findings and conclusions of the court most suited to make such determinations. Under the proper standard of review, the evidence in this case supports the trial court's findings of fact that in turn support its conclusion that at the time the action was filed, Dr. Toporoff was neither willing to testify against Dr. Movahed nor reasonably expected to qualify to do so.

I respectfully dissent.